**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| OWNERS INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:16-cv-0669-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| WARREN MECHANICAL, LLC, *d/b/a* | ) | |
| WARREN MECHANICAL, | ) | |
| | ) | |
| Defendant. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

The following matters are before the court on plaintiff Owners Insurance

Company's ("Owners") motion to compel defendant Warren Mechanical LLC

("Warren") to pay expert fees, ECF No. 26, Owners's motion for summary judgment,

ECF No. 28, and Warren's motion to dismiss, or in the alternative, cross-motion for

summary judgment, ECF No. 37. For the following reasons, the court grants in part

and denies in part Owners's motion for expert fees, denies both parties' motions for

summary judgment, and denies Warren's motion to dismiss.

## I.  BACKGROUND

The instant action arises out of an insurance coverage dispute between

Owners and its insured, Warren, regarding certain alleged misrepresentations in

Warren's January 21, 2015 application for workers' compensation insurance. ECF

No. 28-3, Application. Warren is a medium-sized construction company that

specializes in the propane and natural gas industry. ECF No. 28-1, Steve Dep. 12:11–

14. Warren was founded in 2006 by Steve Warren ("Steve"), who is its sole owner.

In 2014, one of Warren's major customers required it to obtain an "anti-subrogation

endorsement" in its workers' compensation policy.  ECF No. 37 at 3.  Warren

contacted its insurance agent, the Creech Roddy & Watson Insurance Agency

("CRW"), which informed Warren that it would need to switch insurers to obtain the

required coverage.  Id.  Warren's primary contact at CRW, Robert Nalley ("Nalley"),

suggested Owners as a replacement insurer.  Id.

Warren maintains that Steve and Nalley met a few days before CRW

submitted Warren's application for the new policy, but Nalley forgot to bring the

application to the meeting.  Steve Dep. 22:10–24:3.  Rather than retrieve the

application, Nalley asked Steve a number of questions and told Steve he would fill

out the application later.  Id.  Nalley could not provide Steve with a quote for the

policy without first completing the application, so the pair arranged for Steve's wife,

Raynee Warren ("Raynee"), to deliver a check for the premium amount on the policy

to CRW's office at a later date.  Id. at 35:14–36:1.

Nalley did not personally prepare the application.  In fact, Nalley was not

even present at the time the application was completed.  Instead, Aura Lewis

("Lewis"), a newly hired CRW employee, completed the application based on

information provided to her through communications with Nalley.  Lewis Dep. 9:6–

10:23, 34:11–20.  A more senior employee of CRW, Rebecca Hipp ("Hipp"), was

also present when Lewis completed the application.  Id. at 36:4–7.  It was Hipp who

ultimately signed the application on CRW's behalf.  Application at 4.

When Raynee arrived at CRW's office to drop off Warren's premium check,

the CRW receptionist instructed her to sign the application.  ECF No. 37-6, Raynee

Dep. 11:6–20.  Raynee asked CRW whether it was appropriate for her to sign the

application, and was told that it was, at which point she signed the application.  Id. at 12:20–25.  Raynee now claims that she did not have the authority to sign the application, and only did so because she was "in haste" and "didn't think about it." Id. at 13:1–6.  Indeed, Raynee testifies that she did not even read the application, and that CRW pressured her to sign it by telling her that Warren would not be allowed on a job site unless the application was signed immediately.  Id. at 13:20–14:21.

The application stated that:

(1) [Warren's] business operations consisted of "PLUMBING";

(2) [Warren] had only two full-time employees - one "Plumbing NOC & Drivers" employee under National Council on Compensation Insurance ("NCCI") classification code 5183 and one "Clerical Office Employees NOC" employee under NCCI classification code 8810;

(3) [N]one of [Warren's] work was performed above 15 feet; and

(4) [Warren's] business did not give rise to "[a]ny exposure to radioactive materials, flammables, explosives, caustics, fumes, landfills, asbestos, wastes, fuel tanks, etc."

Application at 2–3.  Steve has unambiguously stated that the latter three of these representations were inaccurate.  Steve Dep. 29:2–21, 31:3–21.  As noted above, Steve has also described Warren as a construction company that specializes in the propane and natural gas industry.  Id. at 12:11–14.  While this work certainly involves pipes, Warren has admitted—through its failure to respond to Owners's requests for admission—that neither Warren nor Steve are "licensed plumber[s]" pursuant to S.C. Code § 40-11-410.  ECF No. 28-17, Requests for Admission.

Owners—unaware of these misrepresentations—issued a policy providing the requested coverage for the period of January 22, 2015 to January 22, 2016 (the "Policy").  ECF No. 10 ¶ 11.  Around a month after the Policy was issued, Warren

hired Scott Gerhard ("Gerhard"). Gerhard was injured on December 7, 2015 when nitrogen was released from a propane tank he was working on nearly 20 feet above the ground, causing him to fall and suffer second degree burns. ECF No. 28 at 4–5; ECF No. 34 at 6. Gerhard made a claim to Owners for workers' compensation benefits, which Owners denied on the ground that there was no valid policy in place. ECF No. 37-10, Owners's Denial Letter. Gerhard then filed a hearing request with the South Carolina Workers' Compensation Commission ("SCWCC"). Despite denying coverage, Owners initially hired an attorney to represent Owners and Warren in connection with Gerhard's claim. ECF No. 37-11, Email to Aura Lewis. On April 7, 2016, another attorney appeared in Gerhard's SCWCC case solely on Owners's behalf, and asked the court to find that the Policy did not cover Gerhard's claim. ECF No. 37 at 6. Owners later filed a motion in the SCWCC proceedings to have the Policy declared void ab initio. Id. This motion was denied, pending discovery. ECF No. 44, Dworjanyn Letter. Gerhard's case before the SCWCC was then settled, without the SCWCC making any decision regarding the Policy.

On March 2, 2016, Owners filed the instant federal action seeking to have the Policy declared void ab initio. ECF No. 1 ¶¶ 20–23. On April 11, 2016, recognizing the jurisdictional problems presented by its request, Owners amended its complaint to state that "[n]o employees' rights are involved in this action, as this is solely a dispute between Owners and the insured, Warren Mechanical. The issues in this case are not proper before the [SCWCC]." ECF No. 10 ¶ 14. Owners has further clarified that "this litigation was initiated to provide for the determination as to Owners' duties and obligations under the policy as to any other potential claims that may arise under the

policy at issue," and as such, the court need not "address issues relating to any [of Gerhard's] claims." ECF No. 39 at 2.

Owners filed its motion to compel Warren to pay expert fees on December 15, 2016. ECF No. 26. Owners then filed its motion for summary judgment on December 20, 2016. ECF No. 28. Warren filed a response to the motion to compel on December 29, 2016, ECF No. 34, and Owners filed a reply on January 3, 2017, ECF No. 35. On January 9, 2017, Warren filed a motion to dismiss, or in the alternative, for summary judgment in lieu of a response to Owners's motion for summary judgment. ECF No. 37. Owners filed a joint reply in support of its motion for summary judgment and in response to Warren's motion for summary judgment on January 20, 2017. ECF No. 39. Warren filed a reply on January 27, 2017. ECF No. 41. The matters have been fully briefed and are now ripe for the court's review.

## II. STANDARD

### A.    Subject Matter Jurisdiction

The determination of subject matter jurisdiction must be made at the outset before any decision on the merits. Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998). "The plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged under Rule 12(b)(1)." Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995). If the plaintiff cannot overcome this burden, then the claim must be dismissed. Welch v. United States, 409 F.3d 646, 651 (4th Cir. 2005). When a party contends that "the complaint [] fails to allege facts upon which subject matter jurisdiction can be based[,] . . . all the facts alleged in the complaint are assumed to be true." Luna-Reyes v. RFI Const., LLC, 57 F. Supp. 3d 495, 499 (M.D.N.C. 2014)

(quoting <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir. 1982)).  "[A] trial court should dismiss under Rule 12(b)(1) only when the jurisdictional allegations are 'clearly . . . immaterial, made solely for the purpose of obtaining jurisdiction or where such a claim is wholly unsubstantial and frivolous.'"  <u>Kerns v. United States</u>, 585 F.3d 187, 193 (4th Cir. 2009) (quoting <u>Bell v. Hood</u>, 327 U.S. 678, 682 (1946)).

      **B.**        **Summary Judgment**

      Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  <u>Id.</u> at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>

      "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Id.</u> at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support

the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

The non-movant must then "make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden

of proof at trial."  Id. at 322.  The court should view the evidence in the light most

favorable to the non-moving party and draw all inferences in its favor.  Anderson, 477

U.S. at 255.

### C.    Motion to Compel Payment of Expert Fees

Federal Rule of Civil Procedure 26(b)(4)(E) states that:

> "Unless manifest injustice would result, the court must require that the
> party seeking discovery: (i) pay the expert a reasonable fee for time
> spent in responding to discovery under Rule 26(b)(4)(A) or (D); and
> (ii) for discovery under (D), also pay the other party a fair portion of the
> fees and expenses it reasonably incurred in obtaining the expert's facts
> and opinions."

Fed. R. Civ. P. 26(b)(4)(E).

Courts generally rely on the following factors to determine whether an expert

fee is "reasonable":

> (1) the witness's area of expertise; (2) the education and training that is
> required to provide the expert insight that is sought; (3) the prevailing
> rates for other comparably respected available experts; (4) the nature,
> quality and complexity of the discovery responses provided; (5) the cost
> of living in the particular geographic area; (6) the fee being charged by
> the expert to the party who retained him; (7) fees traditionally charged
> by the expert on related matters, and (8) any other factor likely to be of
> assistance to the court in balancing the interests implicated by Rule 26.

First S. Bank v. Fifth Third Bank, N.A., 2014 WL 3868000, at *4 (D.S.C. Aug. 6,

2014), aff'd sub nom. First S. Bank v. Fifth Third Bank NA, 631 F. App'x 121 (4th

Cir. 2015), Massasoit v. Carter, 227 F.R.D. 264, 265 (M.D.N.C. 2005).  "Manifest

injustice" is normally only found by a court "where the deposing party is indigent[,]

or if requiring the party to pay a deposition fee would create an undue hardship." <u>First S. Bank</u>, 2014 WL 3868000, at *2.

## III.  DISCUSSION

### A.      Warren's Motion to Dismiss

Warren argues that Owners's action to have the Policy declared void <u>ab initio</u> should be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief can be grant.  For both of these grounds, Warren focuses on Owners's failure to bring an actual case or controversy before the court.  Warren's position is as follows: (1) if this action would result in a denial of Gerhard's claim, the court lacks subject matter jurisdiction because such matters are the exclusive purview of the SCWCC, and (2) if this action would only affect subsequent, as yet unknown, claimants, the court lacks subject matter jurisdiction because there is no case or controversy.  ECF No. 37 at 7–9.

The first of these arguments is no longer relevant, as the parties have informed the court that Gerhard's claim before the SCWCC has been settled.

However, it is still necessary to consider Warren's argument that this action fails to present a case or controversy.  Warren contends that there is no case or controversy outside of Gerhard's claim because no other claim has been filed against the Policy, nor could one be, given that the Policy expired on January 22, 2016, and the South Carolina Workers' Compensation Act ("SCWCA") requires injuries to be reported to employers within 90 days, which has not happened.  <u>Id.</u> at 8.  However, the SCWCA actually says that notice should be "given within ninety days after the occurrence of accident or death, <u>unless reasonable excuse is made</u> . . . for not giving

timely notice." S.C. Code § 42-15-20 (emphasis added). Additionally, despite this 90 day reporting requirement, the statute of limitations for filing workers' compensation claims is "within two years after an accident, or if death resulted from the accident, within two years of the date of death." S.C. Code § 42-15-40. Thus, there is at least the possibility that another claim <u>could</u> arise under the Policy.

The question, then, is whether this possibility is enough to present a "case or controversy" under Article III of the Constitution. "The test for a 'case or controversy,' . . . is whether the dispute 'is definite and concrete, touching the legal relations of parties having adverse legal interests.'" <u>White v. National Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 913 F.2d 165, 167–68 (4th Cir. 1990) (quoting <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 240–41, (1937)). "In deciding whether a justiciable controversy exists, a district court looks to 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" <u>Commercial Union Ins. Co. v. Detyens Shipyard, Inc.</u>, 147 F. Supp. 2d 413, 421 (D.S.C. 2001) (quoting <u>White</u>, 913 F.2d at 167–68). The parties' "dispute must be definite and concrete, touching the legal relations of parties having adverse legal interests, real and substantial, and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." <u>Fox Grp., Inc. v. Cree, Inc.</u>, 819 F. Supp. 2d 520, 522–23 (E.D. Va. 2011) (internal alterations and quotation marks omitted) (quoting <u>Prasco, LLC v. Medicis Pharm. Corp.</u>, 537 F.3d 1329, 1334–35 (Fed. Cir. 2008)).

The court acknowledges how Warren could think that Owners has failed to meet this standard. There is no dispute that Gerhard is the only known claimant under the Policy. There is also no indication that another claim is particularly likely. Furthermore, Owners does not attempt to identify any particular source of the hypothetical future claims that it believes provide the basis for this court's jurisdiction. Warren also points to two cases that dismissed similar insurance coverage disputes for lack of jurisdiction where the purported "case or controversy" was—in some respects—more "immediate" and less "hypothetical" than in this case. Warren first highlights Commercial Union, where this court addressed an insurance dispute regarding a sunken drydock. 147 F. Supp. 2d at 420. There, the plaintiff sought a declaration that its "protection and indemnity" policy provided coverage. Id. However, that policy "require[d] wreck removal under statutory authority or [in some] other manner prescribed by law prior [to the] filing [of] a claim." Id. (internal quotation marks omitted). Because this contingency had not occurred, the court found that the plaintiff's declaratory judgment claim did not present a true case or controversy. Id. Warren also cites ACE Am. Ins. Co. v. Michelin N. Am., Inc., 470 F. Supp. 2d 602, 604 (D.S.C. 2007). The ACE decision dealt with a commercial liability insurance policy that insured two distinct entities. Id. at 603. The insurer brought a declaratory judgment action against one of the insureds, seeking a declaration that it did not owe the defendant any coverage in connection with an underlying action filed against the other insured party. Id. The court determined that there was no justiciable case or controversy because the defendant-insured was not even involved in the underlying action, and had not sought any coverage in

connection with it.  Id. at 604–05.  The controversies presented by the Commercial

Union and ACE cases could certainly be seen as more "immediate" than the

controversy presented here.  In those cases, there were at least some facts indicating

that a claim might arise under the policies in question.  Here, the only reason to

believe that Owners might face some future claim is the fact that the Policy exists.

Nevertheless, the existence of the Policy is enough to establish a case and

controversy because the existence of the Policy is the very thing Owners wishes to

challenge.  All of the facts relevant to this dispute have already occurred—if a new

claim were to arise under the Policy, nothing about the claim itself would affect

whether the alleged misrepresentations rendered the Policy void ab initio.  This is

what distinguishes the issue at hand from Commercial Union and ACE.  Those

decisions evaluated the justiciability of coverage disputes that might arise under the

policy, not the justiciability of a dispute about the formation of the policy itself.

Because the dispute in this case deals with the formation of the policy, it is as definite

and concrete as it will ever be.  Therefore, the court finds that this action presents a

justiciable case or controversy.

Warren also argues that, even if this case meets the requirements of Article

III, the court should exercise the discretion afforded by the Declaratory Judgment Act

and decline to hear the action.  ECF No. 41 at 7–9.  The court disagrees.

"A federal court has the discretion to decline to entertain a declaratory

judgment action, but . . . the court must do so only for 'good reason.'"  Cont'l Cas.

Co. v. Fuscardo, 35 F.3d 963, 965–66 (4th Cir. 1994) (quoting Aetna Casualty &

Surety Co, 92 F.2d at 324).

Because the remedial discretion conferred by the Declaratory Judgment Act must be liberally exercised to effectuate the purposes of the statute, . . . [the Fourth Circuit] ha[s] held that a federal district court should normally entertain a declaratory action within its jurisdiction when it finds that the declaratory relief sought (i) will serve a useful purpose in clarifying and settling the legal relations in issue and (ii) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

Id. at 965 (internal alterations and quotations omitted) (quoting Nautilus Ins. Co. v. Winchester Homes, Inc., 15 F.3d 371, 375 (4th Cir. 1994)). In making this determination, a district court must consider the following factors:

(1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state court; (2) whether the issues raised in the federal action can be more efficiently resolved in the pending state action; (3) whether the federal action might result in unnecessary entanglement between the federal and state systems due to overlapping issues of fact or of law; and (4) whether the federal action is being used merely as a device for "procedural fencing," i.e., to provide another forum in a race for res judicata.

Id. at 966.

The court believes that this action will serve a useful purpose and will relieve the uncertainty created by the parties' dispute. Balancing the factors in the above test reinforces this conclusion. First, while the state of South Carolina has an interest in managing workers' compensation claims, the matter before the court is fundamentally an issue of contract formation. Contract disputes are routinely brought before state courts and certainly are decided under state law. However, federal courts are well-equipped to adjudicate contract disputes that are brought before them under diversity jurisdiction. Here, the parties have exercised their right under 28 U.S.C. §1332 to have their state law claim heard before a federal court based on diversity jurisdiction, and the court cannot abstain from ruling on Owners's request for declaratory judgment without "good reason." Second, the issue raised in the current action

cannot be resolved more efficiently in the pending state action, because there is no longer any pending state action. The dispute is now solely about whether or not a valid contract for insurance exists as to potential future claims. Third, there is no chance of entanglement between the state and federal systems, because there are no longer two different court systems adjudicating this case that might produce "overlapping issues of fact or law." Finally, this case is not being used "to provide another forum in a race for res judicata," because this ruling will not be used in a pending state court action.

The factors guiding judicial discretion under the Declaratory Judgment Act fail to provide "good reason" for the court to abstain from exercising jurisdiction in this case. Therefore, the court denies Warren's motion to dismiss.

**B.      Owners's Motion for Summary Judgment**

Owners argues that the Policy should be declared void ab initio based upon Warren's material misrepresentations in its application for insurance. ECF No. 28 at 1. Under South Carolina law, an insurer may void a policy when it establishes: (1) the insured made false statements; (2) the insured knew the statements were false; (3) the statements were material to the risk; (4) the statements were made with the intent to deceive; and (5) the insurer relied upon the statements in issuing the policy. Evanston Ins. Co. v. Watts, 52 F. Supp. 3d 761, 766 (D.S.C. 2014) (citing Strickland v. Prudential Ins. Co. of Am., 292 S.E.2d 301, 304 (S.C. 1982)). It is undisputed that the application for insurance contained certain errors. However, because Warren has not proved as a matter of law that the statements were made with the intent to deceive, the courts denies Owners's motion for summary judgment.

13

### 1. Application Errors

Owners contends that Warren's application for insurance contained four false statements. First, "Warren listed itself as a plumbing contractor rather than including any description indicating it was 'a medium sized construction company dedicated to the propane and natural gas industry.'" ECF No. 28 at 8. This is the only one of the allegedly false statements that Warren disputes, arguing that the classification code used for plumbing accurately classified Warren on the application because it includes working with gas and propane. ECF No. 37-1 at 20. Owners also contends that Warren's application was false in stating that the business: (1) only had two employees when in truth it had six at the time; (2) did not perform work above fifteen feet when it did; and (3) did not involve any exposure to flammables, caustics, or fuel tanks, when Gerhard was in fact injured after exposure to liquefied propane gas. ECF No. 28 at 8. Raynee and Steve's depositions, as well as the report submitted after Gerhard's accident, demonstrate that these three items on the application were indeed false. ECF No. 28-5, Raynee Dep. at 21:23–22:1; Steve Dep. at 31:3–21; ECF No 28-9, Plains Safety Alert.

### 2. Intent to Deceive

Generally, "whether a misstatement of fact in the application was made with the intent to deceive and defraud the insurer is a question for determination by the jury." Bennett v. Am. Hallmark Ins. Co. of Texas, 2011 WL 2936003, at *4 (D.S.C. July 18, 2011) (quoting Arnold v. Life Ins. Co. of Ga., 83 S.E. 2d 553 (S.C. 1954)). However, if there is "no other reasonable or plausible explanation for the applicant's false representations," then the court may infer an intent to deceive. Floyd v. Ohio

Gen. Ins. Co., 701 F.Supp. 1177, 1190 (D.S.C.1988); see Phillips v. Life &

Cas. Ins. Co. of Tennessee, 226 S.C. 336, 342, 85 S.E.2d 197 (1954) (directed verdict

for insurer was proper when the "only reasonable inference warranted by the evidence

is that the policy was procured by fraudulent misrepresentation").  Additionally, "the

mere signing of [an] application containing the answers alleged to be false is not

conclusive" of fraudulent intent.  Peterson v. First Health Life & Health Ins. Co.,

2010 WL 2723113, at *7 (D.S.C. July 9, 2010) (quoting Johnson v. New

York Life Ins. Co.,  164 S.E.2d 175 (S.C. 1932)); see Shenandoah Life Ins. Co. v.

Smallwood, 737 S.E.2d 857, 862 (S.C. Ct. App. 2013) ("The simple fact that an

answer on a signed application is false does not satisfy an insurer's burden of proving

the applicant made the misrepresentation with the intent to defraud the company."),

     Here, there are plausible explanations for the falsities in Warren's application.

No employee of Warren actually filled out the application. Nalley, Warren's primary

contact at CRW, interviewed Steve and then had another CRW employee fill out the

application later.  Although Raynee signed the application—giving her the

opportunity to read it and notice the errors—the mere fact that a Warren employee

signed the document is not conclusive of the company's intent to deceive. It appears

that, throughout the process of several different people being involved in the

preparation and submission of the application, errors were made.  As this is a

plausible explanation for the errors, the court declines to infer an intent to deceive.

Thus, the court finds that Owners failed to prove as a matter of law that the Policy

should be declared void ab initio based upon the errors in Warren's application and

declines to grant summary judgment for Owners.

### C.       Warren's Motion for Summary Judgment

Warren responds to Owner's motion for summary judgment with a motion to dismiss, or in the alternative a motion for summary judgment, contending that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on Owners's claim that the Policy should be declared void.  ECF No. 37 at 1.  As discussed above in Section III.C, there are genuine issues of material fact regarding Warren's intent to deceive Owners by submitting an application containing errors. Thus, the court declines to grant summary judgment to Warren on Owners's action to declare the policy void.

### 1.       Estoppel

In addition to moving for summary judgment on Owners's material misrepresentation claim, Warren raises as an affirmative defense that Owners is estopped from having the contract declared void.  Id.  "Equitable estoppel occurs where a party is denied the right to plead or prove an otherwise important fact because of something which he has done or failed to do."  Parker v. Parker, 443 S.E.2d 388, 391 (S.C. 1994).

> The elements of equitable estoppel as related to the party being estopped are: (1) conduct which amounts to a false representation, or conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention that such conduct shall be acted upon by the other party; (3) actual or constructive knowledge of the real facts. The party asserting estoppel must show: (1) lack of knowledge, or the means of knowledge, of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change of position in reliance on the conduct of the party being estopped.

Strickland v. Strickland, 650 S.E.2d 465, 470 (S.C. 2007).

Warren raises several reasons it believes Owners is estopped from arguing that, based on the errors in the application, a proper insurance policy was never formed. First, Warren argues that CRW was acting as an agent of Owners during the formation of the contract. ECF No. 37-1 at 12. Warren believes that this binds Owners—the principal in the agency relationship—to the Policy, despite the errors. Id. Warren also contends that Owners is estopped from arguing that the Policy was not valid as of March 2015, when Warren applied for a different insurance policy with Owners. Id. at 14–15. Next, Warren argues that the manner in which "Owners undertook the defense of Warren in Gerhard's workers' compensation claim" that arose in December 2015 estops the current declaratory judgment action. Id. at 15. Finally, Warren claims that Owners is estopped from denying the validity of the Policy, which existed from January 2015 to January 2016, because Owners renewed the policy in January 2016. Id. at 16. The court addresses each argument in turn.

### a. Agency

Warren contends that Owners cannot void the Policy, because the insurance agents that submitted the application—Nalley and the other employees at CRW—were acting as agents of Owners, not Warren. Warren appears to insinuate that because Nalley—as Owners's agent—knew that Warren worked with gas lines and propane, his knowledge is imputed to Owners, the principal in the relationship. Id. at 1, 12–13. Owners disputes this agency relationship and suggests that Nalley might in fact be an agent of Warren. ECF No. 39 at 10–11.

The Supreme Court of South Carolina has held that "[q]uestions of agency ordinarily should not be resolved by summary judgment where there are any facts

giving rise to an inference of an agency relationship." <u>Fernander v. Thigpen</u>, 293

S.E.2d 424, 425 (S.C. 1982).   An inference of an agency relationship between CRW

and Owners could be drawn from the fact that: (1) CRW solicits business for Owners,

evidenced by Nalley suggesting Owners as a replacement insurance provider; and (2)

that Warren was instructed to deliver a check for the insurance premium directly to

CRW's office, not to Owners.   On the other hand, facts giving rise to an inference of

an agency relationship between CRW and Warren are: (1) that CRW filled out and

delivered to Owners the insurance application for Warren; and (2) that CRW is an

independent insurance agency, working with multiple insurance carriers, not just

Owners.[1]   <u>See</u> ECF No. 39-2, Nalley Dep. 8:12–15.   Because the facts do not clearly

demonstrate whether CRW and its employees are agents of Owners or Warren, and

because the existence of an agency relationship and "the scope of the alleged agent's

authority are questions of fact for the jury," the court declines to grant summary

judgment on the agency issue.   <u>Holmes v. McKay</u>, 513 S.E.2d 851, 854 (S.C. Ct.

---

[1] Warren argues CRW's power to "solicit and secure applications and bind coverage for contracts of insurance on behalf of Owners Insurance" makes it an agent of Owners.  ECF No. 41 at 9.  By contrast, Owners contends that independent insurance agents are "generally considered to be an agent of the insured."  ECF No. 39 at 10.  The underlying question appears to be whether an insurance agent's authority to bind the insurer necessarily makes him an agent of the insurer, such that the insurer is estopped from voiding the policy on the basis of misrepresentations in the application.  This question is not squarely addressed by the case law, which focuses more on what facts must be shown to establish an insurance agent's ability to bind the insurer.  <u>See</u> <u>Holmes v. McKay</u>, 513 S.E.2d 851, 856 (S.C. Ct. App. 1999) ("Today, we hold that independent insurance agents' licenses with several insurers are, with respect to policies issued on the agents' efforts, evidence of agency with and authority to speak for the insurers for which they are licensed.").  The court refrains from answering this state law question at this time, as it is unnecessary to decide upon the motions for summary judgment.

App. 1999); see Johnson v. Arbabi, 584 S.E.2d 113, 116 (S.C. 2003) ("[W]hether an agency relationship exists is a question of fact . . . .").

### b.      March 2015 Application

In March 2015, about two months after Owners issued the Policy, Warren submitted an application to Owners through CRW for an inland marine insurance policy.  ECF No. 37-1 at 14; ECF No. 37-8, White Dep. at 73:15–74:3.  Warren alleges that this application—which correctly reflects that Warren works with propane—should have alerted Owners to the errors in the January 2015 policy.  Thus, Warren believes that Owners knew of the errors in the original policy nine months before Gerhard's injury, but failed to bring an action to declare the contract void during that time.  Id.  Warren contends that this estops Owner from denying coverage in Gerhard's workers compensation claim.  Id.  That claim has since been settled, and Owners has made it clear that the current action before this court exists solely to determine the contractual relationship between the two parties.

Still, the court considers whether the March 2015 application for the inland marine policy should estop Owners from seeking a declaratory judgment that the Policy is void.  While Warren alleges that Owners knew of the errors in the application for the January 2015 Policy because of the March 2015 application, Owners argues that it was not alerted to the errors, and that Warren's argument misconstrues how the insurance company operates.  Owners points to the deposition testimony of Owners underwriter Jamie White and its expert David L. Stegall ("Stegall"), both of which "have testified [that] the existence of another policy [on one line of business] . . . would not be imputed to another line of business."  ECF No.

39 at 14. White maintains that the March 2015 application for this separate inland marine policy did not make Owners aware of the errors in the application for the Policy at issue, because it is a "separate contract . . . [and] a separate policy altogether," and was issued by a "different underwriter" than the underwriter who worked on the Policy. White Dep. 74:4–8, 17–21, 78:5. Stegall further explains that "Owners is a big company, and [there are] two different departments [that deal with these two different policies]." Stegall Dep. 38:11–21. He states that none of the insurance companies he knows "keep an underwriting file on a company for all lines of business . . . the worker's comp[ensation] underwriter would have no idea that some other policy was written with another policy period on another policy form." Id.

The court finds that there is a genuine dispute as to whether, starting in March 2015, Owners knew of the error in the application for the Policy. Because Warren has failed to prove as a matter of law the Owners had "knowledge of the real facts," the court declines to find that Owners is estopped based on this ground. Strickland, 650 S.E.2d at 470.

### c. Gerhard's Workers' Compensation Claim

Warren next contends that the manner in which Owners handled Gerhard's workers' compensation claim lead Warren to believe that the Policy was still valid, estopping Owners from now claiming it was never valid. ECF No. 13 ¶ 23; ECF No. 37-1 at 15. Specifically, Warren takes issue with Owners undertaking Warren's defense, without reserving its right to have the Policy declared void, and appointing only one attorney to defend them both against Gerhard's claim. Id. Owners, on the

other hand, claims that it did reserve its rights, and that from the moment it learned of Gerhard's claim, it unambiguously demonstrated its intention to deny coverage under the policy because of the material misrepresentations within the application. ECF No. 39 at 15. Specifically, Owners discusses a letter it sent to Warren on December 17, 2015, denying coverage for the claim because the Policy was not valid. Id.; ECF No 37-10, Denial Letter. On March 3, 2016, Owners sent Warren another letter expressing its intent to deny coverage and stating that it "reserves the right to initiate a declaratory judgment action to have a court declare that Auto-Owners has no obligations under the policy." ECF No. 39 at 15; ECF No. 28-15, March 3, 3016 Letter. With that letter, Owners also returned all the premiums that Warren had paid for the Policy thus far. Id.

A reasonable juror could certainly find that these letters indicate that, at least from December 2015 onwards, Owners did not intend to perform under the Policy because it did not consider it to be a valid contract. In that case, Owners would not be estopped from arguing that it believed the policy to be void, at least from December 2015 onwards.

### d. Renewal of the Policy in 2016

The Policy lasted from January 2015 to January 2016, and Owners renewed it for another year in January 2016. The parties have not fully explained this issue in the briefings before the court, but during the hearing on these motions there appeared to be a dispute between the parties about the reason for the renewal. In its motion to dismiss, Warren argues that the renewal shows how Owners held itself out to Warren as though the Policy was valid at that time, supporting Warren's estoppel claim. ECF

No. 37-1 at 15–16. By contrast Owners indicated at the hearing that the policy was renewed because Owners failed to give the required 90 days notice of cancellation and intent not to renew.[2] Tr. 9:2–9. According to Owners, this was because they were not made aware of the errors in the application until December 7, 2015, when Gerhard's claim arose. ECF No 28 at 4. Because this issue has not been sufficiently addressed in the parties' briefs and there is a dispute about the reasons for renewal, the court refrains from deciding whether the 2016 renewal estops Owners from making its current claim to declare the Policy void.

Considering all of the above, the court finds that Warren has failed to prove as a matter of law that Owners is estopped from claiming that the policy should be declared void. Warren argues that there have been multiple instances—from the issuance of the Policy in January 2015 until its renewal in January 2016—alerting Owners to falsities within the application, and that because Owners failed to take any action to declare the policy void after each of those instances, it is now estopped from retrospectively claiming that the policy is void. However, as explained above, for each of these instances, either Owners offers a reasonable explanation, or the law dictates that it is a question best left for the fact-finder.

Furthermore, Warren has not proven all of the elements required under Strickland for a successful estoppel claim. See Strickland, 650 S.E.2d at 470 (listing elements that a party asserting estoppel must prove). First, Warren has not conclusively proven that Owners made any false representations about its intent to

---

[2] White's deposition seems to echo this, stating that the policy was renewed because the decision on renewal was made "maybe 60 days" before the new policy was released on January 21, 2016. White Dep. 61:10–62:22.

continue to perform under the Policy while knowing of the application errors.  To prevail at summary judgment, Warren must also prove as a matter of law that Owners intended that its conduct be acted upon by Warren, and Warren has not put forth any arguments or evidence to that effect.  Next, Warren has not proven that Owners had knowledge of the errors in the application at any point before Gerhard's claim arose, and after Owners did become aware of the errors, it communicated to Warren that it did not consider the Policy to be valid.  Thus, the court declines to grant summary judgment to Warren on its estoppel claim.

### D.    Motion to Compel Payment of Expert Fees

In October 2016, Warren sent Owners a request to depose Owners's expert witness, Stegall.  ECF No. 26-2, Stegall Emails.  In reply, Owners stated its expectation that Warren—as the party requesting discovery—pay Stegall's $2,500 retainer fee.  Id.  Before the deposition took place on November 29, 2016, Warren's attorney informed Owners of its intent not to pay the $2,500 fee, finding it unreasonable for such a short and simple deposition.  ECF No. 26-1, Objection to Fee.

Warren opposes the motion to compel, first on the basis that Stegall is not actually an expert witness, and second because it believes Stegall's fees are unreasonable.

### 1.    Expert Witness

Warren first contends that it should not be compelled to pay expert fees because Stegall is only a fact witness—not an expert witness—and Rule 26(b)(4)(E) requires the party seeking discovery to pay a reasonable fee for experts, not ordinary

witnesses.  ECF No. 34 at 5–6.  The court refrains from determining whether Stegall

qualifies as an expert witness.[3]  Additionally, Owners correctly argues that whether

the court ultimately finds that Stegall qualifies as an expert witness "is not

determinative of whether the costs of deposing him are properly borne by Warren

who requested his deposition."  ECF No. 35 at 2.  As this court has found, "[t]here is

no language in [Rule 26(b)(4)(E)] that specifically limits compensation to experts

whose opinions were ultimately presented at trial."  First S. Bank, 2014 WL 3868000,

at *3 (refusing to excuse defendant from reimbursing plaintiff for expert fees on this

ground).  Rule 26(b)(4)(E) pertains to experts "whose opinions may be presented at

trial," not only those witnesses who are ultimately tendered as experts at trial.  Fed. R.

Civ. P. 26(b)(4)(A) (emphasis added).

## 2.     Reasonableness of Fees

Next, Warren asserts that Stegall's fees are unreasonable.  Federal Rule of

Civil Procedure 26(b)(4)(E) states that "the court must require that the party seeking

discovery [ ] pay the expert a reasonable fee for time spent in responding to

discovery."  Fed. R. Civ. P. 26(b)(4)(E) (emphasis added).  Reasonableness is

determined by a multitude of factors, including the expert's qualifications, the

---

[3] Warren claims that "Stegall did not provide any opinion [ ] which only an expert could give or [for] which an expert was required . . . [and therefore] Stegall's report and his testimony are unnecessary, irrelevant and inadmissible in this case." ECF No. 34 at 7.  To support this claim, Warren invokes Federal Rule of Evidence Rule 702 and case law discussing how expert testimony that does not aid the jury should be excluded.  ECF No. 34 at 5–6.  An order on a motion to compel payment of expert fees is not the appropriate place for the court to determine whether a party's expert witness meets the standards of the Federal Rules of Evidence.  If Warren desires to contest the expert status of one of Owners's witnesses, it may file a motion to exclude the expert.

expertise required to testify on the particular issue, and the prevailing rates for other similarly qualified experts in this field.  <u>First S. Bank</u>, 2014 WL 3868000 at *4.

Warren first questions the reasonableness of Stegall's $2,500 retainer fee. The court finds that the fee is reasonable, based on the <u>First Southern Bank</u> factors. In terms of his expertise, Stegall has been designated a Chartered Property and Casualty Underwriter, has personally underwritten thousands of insurance policies, and has almost 40 years of experience in the insurance and risk management industry.  ECF No. 26-6, Stegall Docs. at 1–2.  He has been deposed about thirty times as an expert for issues relating to insurance underwriting.  ECF No 35-1, Stegall Dep. at 4:22. Stegall's affidavit states that it is his practice "in each instance to request a $2,500 deposit for my time associated with being deposed."  Stegall Docs. at 2.  He reasons that, at his rate of $380.00 per hour, this retainer equals about 6.5 hours, the amount of time he spends in an average deposition.  <u>Id.</u>  Based on all of the above, the court finds Stegall's $2,500 retainer fee to be reasonable.

In addition to his retainer fee, Stegall submitted an invoice of $1,401.33 for fees and expenses from the deposition, <u>id.</u> at 26, which Warren also contests as unreasonable.  This invoice lists an hourly rate of $380.00 and shows that Stegall spent two hours on "Deposition Preparation"—for a total of $760.00—and an hour and a half on "Deposition Document Retrieval"—for a total of $570.00.  These fees combine with the $71.33 he spent on "Printing" to total $1,401.33 worth of deposition expenses for Warren to pay.

Warren contends that Stegall's lack of preparation for the deposition and his inadequate answers during the deposition render this sum unreasonable.  ECF No. 34

at 8.  Warren lists several reasons it believes that Stegall was unacceptably unprepared, the most significant being his failure to bring certain necessary documents with him to the deposition.  ECF No. 34 at 4, 9–10. The subpoena notifying Stegall of the deposition required him to bring a "complete copy of [his] entire file, including any and all documents, notes, correspondence, emails, drafts, memoranda, research material, or other prepared documents as it relates to this case." Stegall Docs. at 22.  During the deposition, however, Stegall revealed that—due to a misunderstanding—he had not brought anything with him, even though documents about the case had been sent to him by Owners' lawyer.  Stegall Dep. at 5:7–9:18.  He apologized and offered to go print them at his office, stating that this was "a little unusual . . . I have only done one other telephonic deposition, and so usually the attorney is here in person and hands me the stuff."  Id.  Stegall spent an hour and a half printing the materials before returning to complete the deposition.

The court finds it was unreasonable for Stegall to charge $570.00 to retrieve documents that he should have brought with him.  See Borel v. Chevron U.S.A. Inc., 265 F.R.D. 275, 278 (E.D. La. 2010) (reducing the expert fees in part by finding it unreasonable to spend three hours preparing for a three hour deposition, particularly when the expert "failed to bring his report and any material reviewed to the deposition.").  Stegall claims that he did not bring the necessary information with him because of a misunderstanding between him and the attorneys about expectations for the deposition.  However, as an experienced witness, Stegall should have been familiar with the subpoena requirements and communicated with the attorneys about the procedure for this telephonic deposition.

The court also finds it unreasonable for Stegall to charge Warren $760.00 for two hours of deposition preparation. Stegall set his retainer fee at $2,500 because—at $380.00 per hour for 6.5 hours—it covers the cost of an average deposition. Here, the cost of deposition preparation should be subsumed into that retainer fee. Additionally, it is the duty of the party retaining the expert witness to prepare their witness for deposition and trial. Stegall is Owners's expert witness, and Owners is already paying him to prepare for deposition and trial. It is unreasonable, then, to have Warren pay for preparation time as well, since Warren is deposing Stegall on the same subject matter.

Thus, the court grants in part and denies in part Owners's motion to compel payment of expert fees. The court directs Warren to pay the $2,500 retainer fee and the $71.33 fee for his printing expenses. However, Warren is not required to pay the $570.00 fee for document retrieval or the $760.00 fee for Stegall's deposition preparation, as they are unreasonable expenses.

## IV.  CONCLUSION

For the foregoing reasons, the court **DENIES** Owners's motion for summary judgment, **DENIES** Warren's motion to dismiss and, in the alternative, motion for summary judgment, and **GRANTS IN PART** and **DENIES IN PART** Owners's motion to compel payment of expert fees.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 29, 2017**
**Charleston, South Carolina**